**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA, MACON DIVISION**

| | | |
|---|---|---|
| JAY OTERO, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | FILE NO. 5:04-CV-0211-4 (DF) |
| vs. | : | |
| | : | |
| GEORGE VITO, D.P.M., | : | |
| FOOT & LEG CENTERS GEORGIA, P.C., | : | |
| SURGICAL CENTERS OF GEORGIA, P.C. | : | |
| and MIDDLE GEORGIA HOSPITAL, L.L.C. | : | |
| | : | |
| Defendants. | : | |

_____

**PLAINTIFF'S FIRST AMENDED COMPLAINT FOR DAMAGES**

Pursuant to this Court's Order dated March 17, 2005, Plaintiff Otero submits his First

Amended Complaint for Damages to add the following Counts:

**COUNT IX**

**BATTERY**

115.

Paragraphs 1 through 114 of Plaintiff's original complaint are incorporated herein by

reference.

116.

George Vito is not a licensed medical doctor.

117.

Only licensed medical doctors are allowed to perform cosmetic limb-lengthening surgery

in Georgia.

118.

Defendant Vito represented to Plaintiff Otero that he was authorized under Georgia law to perform a cosmetic limb-lengthening procedure on Plaintiff Otero.  This representation was false.

119.

Defendant Vito performed cosmetic limb lengthening surgery on Plaintiff Otero by surgically cutting into his legs, breaking both tibias and fibulas, and placing an external fixator on both legs.

120.

Prior to performing the cosmetic limb-lengthening procedure on Plaintiff Otero, Defendant Vito caused Plaintiff Otero to execute an informed consent.

121.

The informed consent Defendant Vito caused Plaintiff to execute is invalid as a matter of law in that it was obtained by Defendant Vito for him to perform a procedure that he was not authorized to perform.

122.

The informed consent Defendant Vito also was obtained under false pretenses—George Vito represented that he was authorized under Georgia law to perform this surgery when, in fact, he was not.  By causing Plaintiff Otero to sign this document and without having the authority to perform this procedure, Defendant Vito fraudulently induced Plaintiff Otero to undergo this procedure.

123.

By failing to inform Plaintiff Otero that he was not authorized to perform cosmetic limb-

lengthening surgery and then surgically breaking his legs, Defendant Vito committed a battery. Moreover, since Defendant Vito did not obtain a valid consent to perform this procedure, he did not have permission to commit this battery.

124.

As Defendant Vito was not legally authorized to perform the surgery on Plaintiff Otero, Defendant Vito committed a battery by breaking Plaintiff Otero's legs and placing external fixators on them.

125.

As a result of this battery, Plaintiff suffered substantial and permanent injuries, including the significant and substantial loss of function of his legs.

126.

Defendant Vito is liable to Plaintiff for any and all damages that resulted from this battery.

## <u>COUNT X</u>

**CIVIL GEORGIA RICO CLAIMS AGAINST DEFENDANTS VITO, FOOT AND LEG CENTERS OF GEORGIA, P.C. AND MIDDLE GEORGIA HOSPITAL**

127.

Paragraphs 1 through 126 of the Complaint are hereby re-alleged and incorporated as if fully set forth herein.

128.

Defendants Vito, Foot & Leg Centers of Georgia, P.C. and Middle Georgia Hospital, at all times material hereto, operated as enterprises as defined by O.C.G.A. § 16-14-3(6).

129.

Defendants Vito and Foot and Leg Centers of Georgia, P.C. advertised via the internet that Defendant Vito could legally perform a procedure known as "cosmetic limb lengthening." This representation was false.

130.

The internet uses telephone lines, cables and other modes to transfer data from one person to another.

131.

Plaintiff Otero was induced to undergo cosmetic limb lengthening in part due to his reliance upon Defendants' internet advertising touting Dr. Vito as competent and authorized to perform cosmetic limb lengthening in the State of Georgia.

132.

Plaintiff Otero, a California resident, was further induced to undergo cosmetic limb lengthening through multiple interstate phone conversations with Defendant Vito and later meetings with Defendant Vito.

133.

Plaintiff Otero mailed a check utilizing the United States Postal System in the amount of $53,000.00 (Fifty three thousand and 00/100 dollars) made payable to Defendant Vito in exchange for Defendant Vito's performance of cosmetic limb lengthening on him.

134.

Defendant Vito received the aforementioned check through the United States Postal System and deposited it into a checking account.

135.

By depositing it into his checking account, Defendant Vito caused the bank to utilize wire transfers to cause money set aside by Plaintiff Otero in one bank account to be transferred into an account controlled by Defendant Vito and/or Foot & Leg Centers.

136.

Defendant Vito was not authorized under any law to perform cosmetic limb lengthening surgery on an individual such as Plaintiff with perfectly healthy limbs.

137.

By advertising via the internet, using the United States Postal System and phone lines for purposes of fraudulently inducing Plaintiff Otero into undergoing this illegal scheme, Defendant Vito and Foot & Leg created an illegal scheme in order to take money to which they were not entitled.

138.

Defendant Vito claimed that he was authorized under Georgia law to perform this surgery in order to induce Plaintiff Otero to pay him $53,000.00 in order to undergo this procedure.

139.

Plaintiff Otero relied to his detriment on the false statement that Defendant Vito was authorized under Georgia law to perform this procedure on him.

140.

Had Plaintiff Otero been advised that Defendant Vito was not permitted under Georgia law to perform cosmetic limb lengthening upon an individual such as Plaintiff who presents with perfectly healthy limbs, Plaintiff Otero would not have agreed to pay Defendant Vito $53,000 and undergone this surgery on his legs.

141.

Defendants Vito and Foot & Leg repeatedly and fraudulently misrepresented Defendant Vito's ability and competencies to perform cosmetic limb-lengthening surgery on Plaintiff.  Such communications were made via wire communications, including the internet and telephone.

142.

The aforementioned communications made by Defendant Vito and Foot & Leg were made with the intent to deceive and fraudulently induce Plaintiff Otero into paying for and then undergoing a procedure by someone who was not authorized to perform it.

143.

The scheme of causing Plaintiff Otero to undergo this surgery based on fraudulent representations further involved the United States Postal System in that the Plaintiff Otero's check was transmitted through the US Mail.

144.

Mail and wire fraud are predicate acts under Georgia's RICO statute, O.C.G.A. § 16-14-1 et seq.

145.

Defendants Vito and Foot & Leg committed mail and wire fraud as they created a scheme that caused Plaintiff Otero to pay $53,000.00 for a procedure which they had no legal right to perform despite their assertions to the contrary.

146.

Defendants Vito and Foot & Leg further committed a battery on Plaintiff Otero as they committed an unauthorized touching when Defendant Vito performed this illegal surgery on Plaintiff Otero by maliciously causing him to undergo this procedure.

147.

Under O.C.G.A. § 16-5-24(a), a person commits an aggravated battery when he "maliciously causes bodily harm to another by depriving him or her of a member of his or her body, by rendering a member of the body useless, or by seriously disfiguring his or her body or a member thereof."

148.

Defendants Vito and Foot & Leg committed an aggravated battery on Plaintiff Otero as they "maliciously caused bodily harm" on him "by depriving him…of a member of his…body, by rendering a member of the body useless, or by seriously disfiguring…a member thereof."

149.

Defendant Vito testified that he does not know if he was or is "competent" to perform limb lengthening surgery on Plaintiff Otero.  Such testimony demonstrates the malicious nature of said battery as someone who lacks the competency and who is not authorized under the law should not break someone's legs for pecuniary gain.

150.

Defendant Vito performed this procedure on several individuals before performing it on Plaintiff Otero, leaving them with severe and debilitating deformities.  Yet, he deliberately failed to inform Plaintiff Otero of these deformities and proceeded with the surgery.  Again, this demonstrates the malicious nature of said battery.

151.

Aggravated battery constitutes a predicate act under Georgia's RICO statute.

152.

In performing this illegal surgery on Plaintiff Otero, Defendant Vito, a podiatrist,

engaged in the unlawful practice of medicine.  Only a licensed medical doctor is authorized to perform this surgery.

153.

By engaging in the unlawful practice of medicine, Defendant Vito acted in a deliberate and malicious manner so as to defraud Plaintiff and cause severe, permanent, disfiguring and crippling injuries to Plaintiff's legs.

154.

Defendant Vito and Foot & Leg by committing multiple acts of fraud and misrepresentation of his legal authority to perform cosmetic limb lengthening engaged in wire fraud and mail fraud constituting racketeering activity as defined by O.C.G.A. §16-14-3 (9)(A) and by 18 U.S.C. §§ 1341 and 1343.

155.

Defendant Vito and Foot & Leg also committed multiple predicate acts of battery and mail and wire fraud, as defined by Georgia law.

156.

Plaintiff is entitled to recover from Defendants Vito and Foot & Leg under Georgia's RICO statute, O.C.G.A. § 16-14-1 et seq., all appropriate civil penalties, including but not limited to, treble damages, punitive damages, attorneys fees and costs, damages allowed by O.C.G.A. §16-14-6 and all other remedies available under the Georgia Civil RICO statute and Georgia law, including but not limited to economic and all personal injury damages.

157.

Middle Georgia Hospital was a for-profit hospital that charged for the use of its facilities in the performance of the cosmetic limb-lengthening surgery on Plaintiff Otero.

158.

Middle Georgia Hospital was a licensed medical facility that authorized podiatrists and physicians to utilize its facilities.  Said process is referred to as credentialing.

159.

Middle Georgia Hospital credentialed Defendant Vito to use its facilities.

160.

Middle Georgia Hospital was a for-profit hospital in that it charged patients for the use of its facilities with the intent to make money for its parent corporation and its shareholders.

161.

Middle Georgia Hospital is liable to Plaintiff Otero under Georgia's RICO statute as it, along with Defendant Vito and Defendant Foot & Leg, created and participated in an illegal scheme for purposes of profit by authorizing and credentialing Defendant Vito to perform illegal surgery at its facility.

162.

In order to credential Defendant Vito to use its facility to perform cosmetic limb-lengthening surgery, Middle Georgia Hospital utilized the United States Postal System and the wires to obtain information regarding Defendant Vito.

163.

The use of the United States Postal System and the wires included but was not limited to the gathering of information as to whether Middle Georgia Hospital would authorize Defendant Vito to perform cosmetic limb lengthening procedures of patients at its facility.

164.

After receiving certain information in the mail, including but not limited to Defendant

Vito's application for privileges and raw data regarding Defendant Vito's competencies, Middle Georgia Hospital authorized Defendant Vito to utilize its facility to perform an illegal procedure at its facility, namely cosmetic limb-lengthening surgery.

165.

Middle Georgia Hospital communicated its decision authorizing Defendant Vito to perform this illegal procedure at its facility through the United States Mail and/or through the wire.

166.

Defendant Middle Georgia engaged in a pattern or racketeering in that it has engaged in wire fraud and mail fraud associated with credentialing Defendant Vito to perform an illegal procedure as defined by O.C.G.A. §16-14-3 (9)(A) and by 18 U.S.C. §§ 1341 and 1343.

167.

Middle Georgia Hospital profited from credentialing Defendant Vito to perform this illegal procedure at its facility in that it charged money for use of its facilities.  It used mail and/or wires to transmit bills and collect money for the illegal services it and Defendant Vito rendered at the Hospital's facility.

168.

Middle Georgia Hospital deposited proceeds from the use of its facilities and services it provided for Plaintiff Otero and caused said funds to be wired into and out of its account.

169.

Middle Georgia Hospital is not allowed to receive money for an illegal procedure.

170.

Middle Georgia Hospital received money for the illegal procedure Defendant Vito

performed on Plaintiff Otero at its facilities.

171.

The aforementioned acts are predicate acts under Georgia's RICO statute, entitling Plaintiff Otero to recover from Middle Georgia Hospital for violating said statute.

172.

Plaintiff is entitled to recover from Middle Georgia Hospital under Georgia's RICO statute, O.C.G.A. § 16-14-1 et seq., all appropriate civil penalties, including but not limited to, treble damages, punitive damages, attorneys costs and fees, damages allowed by O.C.G.A. §16-14-6 and all other remedies available under the Georgia Civil RICO statute and Georgia law, including but not limited to economic and all personal injury damages.

## COUNT XI

## NEGLIGENT GRANT OF STAFF PRIVILEGES—HOSPITAL

173.

Paragraphs 1-174 are incorporated herein by reference including but not limited to COUNT VI that relates to Negligent Grant of Staff Privileges.

174.

Defendant Vito performed the subject cosmetic limb-lengthening surgery on Plaintiff Otero August 7, 2002 at Defendant Hospital's facility.

175.

Defendant Hospital authorized Defendant Vito to perform cosmetic limb-lengthening procedures at its facility.

176.

In Georgia, cosmetic limb lengthening procedures can be performed only by licensed medical doctors.

177.

In Georgia, a podiatrist cannot perform cosmetic limb lengthening procedures.

178.

Defendant Vito is not a licensed medical doctor; he is a licensed podiatrist.

179.

Defendant Hospital authorized Defendant Vito to perform an illegal procedure at its facility.

180.

Defendant Hospital has a direct and independent responsibility to its patients to ensure that podiatrists utilizing hospital facilities are qualified and legally authorized to perform the procedures for which privileges are granted.

181.

In granting surgical privileges to Defendant Vito, Defendant Hospital knew or should have reasonably known Defendant Vito was not permitted by law to perform the surgical procedure(s) undergone by Plaintiff Otero at Defendant Hospital's facility; Defendant Hospital knew or should have reasonably known of the requirements of the Georgia Podiatry Practice Act and that the surgeries performed by Defendant Vito exceeded the scope of podiatry practice permitted under the Act.  Therefore, Defendant Hospital breached its duties to Plaintiff Otero by authorizing Defendant Vito to use its facility for illegal purposes.

182.

Defendant Hospital was further negligent in failing to assure that Dr. Vito was competent to perform these surgeries.

183.

At the time of the surgery on Plaintiff Otero, Defendant Hospital was aware of at least one other individual who had undergone this procedure at its facility who was left debilitated and crippled.

184.

At the time of the surgery on Plaintiff Otero, Defendant Hospital and Defendant Vito had been sued by another individual, Sabih Kalidy, who was left debilitated and crippled as a result of cosmetic limb lengthening surgery being performed on him at Defendant Hospital's facility by Defendant Vito.

185.

Before the surgery on Plaintiff Otero, Defendant Hospital and Defendant Vito were represented by the same law firm in the action filed by Sabih Kalidy.

186.

Defendant Hospital was aware of should have been aware that as a direct and proximate cause of Defendant Vito's negligence, Sabih Kalidy was left debilitated and crippled.

187.

By allowing Defendant Vito to perform surgery on Plaintiff Otero after having full knowledge that he had injured Sabih Kalidy, Defendant Hospital was negligent.  Said negligence directly and proximately resulted in injury to Plaintiff.

187.

Defendant Vito recently testified that he does not know if he was competent to perform cosmetic limb-lengthening surgery and treat patients who had undergone cosmetic limb-lengthening surgery.

188.

Dr. Vito was and is not competent to care for abnormal angulation of the legs.

189.

In credentialing a patient, the Hospital is required to assess an applicant's history for a particular surgical procedure in order to determine if the applicant is competent to perform such a procedure.

190.

As part of its ongoing credentialing process, the Hospital owed a duty to look at prior cosmetic limb-lengthening surgeries Defendant Vito had performed and analyze whether he was competent to perform said procedure.

191.

Before Plaintiff Otero had surgery at the facility, Defendant Vito had performed at least eight other cosmetic limb-lengthening procedures at Defendant Hospital's facility.

192.

Of these eight procedures done before Plaintiff Otero's surgery, at least 25% of the patients who underwent this procedure suffered severe and debilitating injuries, including but not limited to being crippled.

193.

Defendant Hospital was aware or should have been aware that Defendant Vito had a very substantial failure rate that resulted in severe injuries to the patients who underwent this procedure at Defendant Hospital's facility.

194.

Defendant Hospital breached its duty to properly credential Defendant Vito in that it continued to allow him privileges despite the high failure rates associated with this procedure.

195.

Defendant Vito performed cosmetic limb-lengthening surgery at Defendant Hospital's facility on Sabih Kalidy, who underwent this surgery on or about March 29, 2000.

196

As a result of the care at the hands of Defendant Vito, Mr. Kalidy was left crippled that required painful and expensive surgery to repair.  His injuries are permanent and debilitating.

197.

Defendant Hospital was aware before Defendant Vito performed surgery on Plaintiff Otero that Mr. Kalidy had been left crippled as a result of this procedure.

198.

Defendant Hospital, by and through its agents and counsel, was aware that Defendant Vito had fraudulently re-written Mr. Kalidy's medical chart before Plaintiff Otero's surgery.

199.

Defendant Hospital, by and through its agents and counsel, was aware that Defendant Vito had falsified Kalidy's chart before Plaintiff Otero's surgery in at least the following ways:

1)  Defendant Vito created entries in which Mr. Kalidy purportedly "confessed" his noncompliance in the presence of a nurse who could not have been present at the time the note was made as she was away on sick leave at the time of the purported act;

2)  in a note dated April 4, 2001 upon which a typewritten reference *to another patient who was not a patient of the practice until April of 2002* appears; and

3)  in a note dated September 11, 2001, Mr. Kalidy allegedly confessed his transgressions in Dr. Vito's office while in reality Mr. Kalidy was in Oklahoma because of the national crises occurring on that date.

200.

Even though aware of Mr. Kalidy's horrific outcome and knowledge that Mr. Kalidy's records were altered, Defendant Hospital negligently authorized Defendant Vito to continue to perform illegal surgery on patients such as Plaintiff Otero at its facility.

201.

Furthermore, Defendant Hospital was aware through its agents that Defendant Vito had engaged in criminal acts of medical record fraud prior to Plaintiff Otero's surgery on August 7, 2002.

202.

Despite having knowledge of record fraud regarding Defendant Vito's care of Mr.
Kalidy, Defendant Hospital authorized Defendant Vito to perform illegal cosmetic limb-
lengthening surgery at its facility on Plaintiff Otero.

203.

Defendant Hospital authorized Defendant Vito to perform cosmetic limb-lengthening on
another patient, Gurjit Dhillon, on September 27, 2001.

204.

Shortly after the initial surgery but well before Plaintiff Otero's surgery, Mr. Dhillon
experienced unnecessary and uncorrected complications that resulted in him becoming crippled.

205.

Defendant Vito altered, modified, and destroyed part of Mr. Dhillon's medical chart.

206.

Defendant Vito has testified under oath that he destroyed certain records created by
another podiatrist who was licensed to practice podiatry in Georgia concerning Defendant Vito's
care and treatment of Mr. Dhillon.

207.

Even with knowledge that Mr. Dhillon had been crippled at the hands of Defendant Vito,
Defendant Hospital did not undertake any remedy to prevent Defendant Vito from crippling
others, including but not limited to Plaintiff Otero.

208.

Defendant Hospital was negligent in that it failed to adequately evaluate Defendant
Vito's success and/or failure rates in the past performance of cosmetic limb-lengthening

procedures, including but not limited to Mr. Kalidy and Mr. Dhillon, and as such, authorized an incompetent person to perform this procedure at its facility.

209.

Defendant Hospital is liable to Plaintiff Otero for allowing a known incompetent podiatrist to perform a surgical procedure on him at its facility with knowledge that he had crippled and maimed others before him.

## COUNT XI

## NEGLIGENT GRANT OF STAFF PRIVILEGES—SURGICAL CENTERS

210.

Paragraphs 1-209 are incorporated herein by reference including but not limited to COUNT VI that relates to Negligent Grant of Staff Privileges against Surgical Centers.

211.

Defendant Vito performed certain non-limb-lengthening surgeries on Plaintiff Otero at Surgical Center's facility.

212.

Defendant Surgical Centers authorized Defendant Vito to perform these non-limb-lengthening surgical procedures at its facility.

213.

Defendant Vito recently testified that he did not know if he was competent to care for Plaintiff Otero.

214.

Defendant Vito represented before these surgical procedures that he was competent to perform these surgeries on Plaintiff Otero.

215.

The assertion that he was competent was false as he has now admitted that he does not know if he had the competency to perform these non-limb-lengthening surgeries on Plaintiff Otero.

216.

In granting surgical privileges to Defendant Vito, Defendant Surgical Centers knew or should have reasonably known Defendant Vito was not competent to perform the surgical procedure(s) undergone by Plaintiff Otero at Defendant Surgical Center's facility.  Therefore, Defendant Surgical Center breached its duties to Plaintiff Otero by authorizing Defendant Vito to use its facility for purposes for which he is incompetent.

217.

Defendant Hospital was further negligent in failing to assure that Dr. Vito was otherwise competent to perform these surgeries.

218.

In credentialing a patient, Defendant Surgical Center looks to the applicant's surgical success rate.

219.

As part of its ongoing credentialing process, Defendant Surgical Centers owed a duty to look at prior non-limb-lengthening surgeries Defendant Vito had performed and analyze whether he was competent to perform said procedures.

220.

Defendant Surgical Center was aware or should have been aware that Defendant Vito had a very substantial failure rate that resulted in severe injuries to the patients who underwent these procedures at Defendant Surgical Center's facility.

221.

Defendant Surgical Center breached its duty to properly credential Defendant Vito in that it continued to allow him privileges despite the high failure rates associated with these procedures.

222.

Defendant Vito performed non-limb-lengthening surgery at Defendant Surgical Center's facility on Sabih Kalidy.

223.

As a result of care at the hands of Defendant Vito, Mr. Kalidy was left crippled that required painful and expensive surgery to repair.  To this day, many of his injuries are permanent and debilitating.

224.

Defendant Surgical Center, through its agents and counsel, was aware before Defendant Vito performed surgery on Plaintiff Otero that Mr. Kalidy had been left crippled as a result of the care Defendant Vito afforded him.

225.

Defendant Surgical Center, by and through its agents and counsel, was aware that Defendant Vito had fraudulently re-written Mr. Kalidy's medical chart before Plaintiff Otero's surgeries.

226.

Defendant Surgical Center, by and through its agents and counsel, was aware that Defendant Vito had falsified Kalidy's chart before Plaintiff Otero's surgery in at least the following ways:

4)  Defendant Vito created entries in which Mr. Kalidy purportedly "confessed" his noncompliance in the presence of a nurse who could not have been present at the time the note was made as she was away on sick leave at the time of the purported act;

5)  in a note dated April 4, 2001 upon which a typewritten reference *to another patient who was not a patient of the practice until April of 2002* appears; and

6)  in a note dated September 11, 2001, Mr. Kalidy allegedly confessed his transgressions in Dr. Vito's office while in reality Mr. Kalidy was in Oklahoma because of the national crises occurring on that date.

227.

Even though aware of Mr. Kalidy's horrific outcome and knowledge that Mr. Kalidy's records were altered, Defendant Surgical Centers negligently authorized Defendant Vito to continue to perform surgery on patients such as Plaintiff Otero at its facility.

228.

Despite having knowledge of record fraud regarding Defendant Vito's care of Mr. Kalidy, Defendant Surgical Center negligently authorized Defendant Vito to perform surgery at its facility.

229.

Defendant Surgical Centers authorized Defendant Vito to perform surgery on another patient, Gurjit Dhillon.

230.

Mr. Dhillon experienced unnecessary and uncorrected complications that resulted in him becoming crippled.

231.

Defendant Vito altered, modified and destroyed part of Mr. Dhillon's medical chart.

232.

Defendant Vito has testified under oath that he destroyed certain records created by another podiatrist he was supervising and who was licensed to practice podiatry in Georgia concerning his care and treatment of Mr. Dhillon.

233.

Even with knowledge that Mr. Dhillon had been crippled at the hands of Defendant Vito, Defendant Surgical Centers did not undertake any remedy to prevent Defendant Vito from crippling others, including but not limited to Plaintiff Otero.

234.

Defendant Surgical Centers was negligent in that it failed to adequately evaluate Defendant Vito's success and/or failure rates in the past performance of non-limb-lengthening surgical procedures, including but not limited to Mr. Kalidy and Mr. Dhillon, and as such, authorized an incompetent person to perform these procedures at its facility.

235.

Defendant Surgical Centers is liable to Plaintiff Otero for allowing a known incompetent podiatrist to perform surgical procedures on him at its facility with knowledge that he had crippled and maimed others before him.

WHEREFORE, Plaintiff Otero seeks all damages claimed above and in his Original Complaint.

Respectfully submitted this 31st day of March 2005.

/S/ Prescott L. Nottingham____
Prescott L. Nottingham
Ga. Bar. No. 547345

6385 Black Water Trail
Atlanta, Georgia 30328
(404) 303.0740

/S/ Mark A. Inman_____
Mark A. Inman
Ga. Bar No.: 383610

260 Peachtree St. NW
Suite 1200
Atlanta, Georgia 30303
(404) 524-9455

Attorneys for Jay Otero

CERTIFICATE OF SERVICE

This is to certify that I have this day placed a true, correct copy of the foregoing pleading in the United States Mail, postage prepaid, to all counsel of record.

This 31st day of March 2005

/S/ Scott L. Nottingham_____
Scott L. Nottingham